**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ROCK HILL DIVISION**

| | |
|---|---|
| _____ )<br>**UNITED STATES OF AMERICA ex rel**.  )<br>**JACQUELINE MEYER and MICHAEL COWLING,**  )<br>**STATE OF FLORIDA ex rel**.  )<br>**JACQUELINE MEYER and MICHAEL COWLING,**  )<br>**STATE OF GEORGIA ex rel**.  )<br>**JACQUELINE MEYER and MICHAEL COWLING,**  )<br>**STATE OF NORTH CAROLINA ex rel**.  )<br>**JACQUELINE MEYER and MICHAEL COWLING,**  )<br>**STATE OF OKLAHOMA ex rel**.  )<br>**JACQUELINE MEYER and MICHAEL COWLING,**  )<br>**STATE OF TENNESSEE ex rel**.  )<br>**JACQUELINE MEYER and MICHAEL COWLING,**  )<br>**STATE OF TEXAS ex rel**.  )<br>**JACQUELINE MEYER and MICHAEL COWLING,**  )<br> )<br> )<br>**Plaintiffs,**  )<br> )<br>**v.**  )<br> )<br>**HEALTH MANAGEMENT ASSOCIATES, INC.,**  )<br>**GARY D. NEWSOME,**  )<br>**EMERGENCY MEDICAL SERVICES**  )<br>**CORPORATION, and**  )<br>**EMCARE, INC.**  )<br> )<br>**Defendants.**  )<br>_____ ) | **CIVIL ACTION NO.** 0:11-cv-01713-JFA<br><br><br><br><br><br><br><br><br><br>**FILED UNDER SEAL**<br>**(PURSUANT TO**<br>**31 U.S.C. § 3730(b))**<br><br><br><br>**COMPLAINT**<br>**JURY TRIAL**<br>**DEMANDED** |

## COMPLAINT

(Federal and State False Claims Acts; Tortious Interference with Business Relationship)

## SUMMARY OF THE ACTION

1)      This is an action against Defendant Health Management Associates, Inc.

("HMA"), a publicly-traded corporation that operates 59 general acute-care hospitals in non-

urban communities throughout the United States, Defendant Gary D. Newsome, HMA President

and Chief Executive Officer (CEO), and Defendants Emergency Medical Services Corporation

and its wholly-owned subsidiary, EmCare, Inc. (hereinafter "EmCare defendants" or "EmCare"),

one of the nation's largest providers of hospital emergency room physician services, for violating

the False Claims Acts ("FCAs") of the United States and the States of Florida, Georgia, North

Carolina, Oklahoma, Tennessee and Texas.

      2)     Defendants HMA and Newsome are engaged in a nation-wide, systematic

practice of maximizing corporate profits by unlawfully inducing and pressuring physicians

serving HMA hospitals, including but not limited to physicians working for the EmCare

defendants, to increase the number of inpatient admissions of patients visiting HMA's

emergency rooms ("ER inpatient admissions"), without regard to whether the admissions are

medically necessary.  Over the last several years, HMA's executive management, including

defendant Newsome, have developed and implemented corporate-wide practices and procedures

at all HMA hospitals to pressure Emergency Room ("ER") physicians to admit more patients.

These practices and procedures include:

- setting target ER inpatient admission rates --  including a corporate-wide  target ER inpatient admission rate of      50% for Medicare-eligible patients -- designed solely to boost admissions;

- requiring medical staff to order a computer-generated series of diagnostic tests (testing protocols) on each ER patient, even when some or all of the tests are medically unnecessary;

- using a comprehensive management system to track the admission rate of every ER physician and the number of tests ordered for each of his or her patients through daily, weekly and monthly corporate-generated reports;

- conditioning the continued employment of ER physicians and medical directors on their success in increasing the number of ER inpatient admissions and adherence to the testing protocols;

- threatening to terminate and actually terminating hospital CEOs who would not coerce physicians to admit more patients;

- paying bonuses to ER physicians who meet corporate benchmarks designed to increase ER inpatient admissions;

- instructing physicians to keep running tests on patients until the doctors found a justification for admitting them; and

- requiring non-medical administrators, including hospital CEOs, to conduct daily meetings with ER physicians to review so-called "missed admissions."

3)      Several emergency care physician practices under contract with HMA hospitals refused to be a party to HMA's unlawful coercive tactics to drive up the amount of hospital admissions; in response, HMA terminated or did not renew its contracts with these emergency care physician practices to service HMA's ERs.

4)      By contrast, the EmCare defendants proved to be willing and equally corrupt partners with HMA.  To obtain and retain HMA's lucrative business, the EmCare defendants colluded with HMA and Newsome to raise ER inpatient admissions and demanded, as a condition of employment, that EmCare physicians and medical directors maximize inpatient admissions and order HMA pre-selected diagnostic tests, regardless of whether the physicians actually believed the admissions or the tests were medically warranted.  EmCare, at HMA's direction, repeatedly terminated physicians and ER medical directors who insisted on basing admission decisions and diagnostic testing solely on the medical needs of their patients, and not

3

the corporation's profits.  EmCare also terminated its own corporate managers who refused to coerce physicians to raise admission rates.

5)      In using the award, renewal and termination of physician contracts, and the compensation paid to physicians thereunder, as a carrot and a stick to induce physicians to recommend hospital admission for patients visiting HMA's ERs and to follow testing protocols, defendants violated and continue to violate the federal Anti-Kickback Statute ("AKS") and analogous state statutes.  The AKS, which prohibits any form of payment intended to induce or reward any person for recommending federally-funded medical services, was designed to ensure that medical decisions, such as hospital admissions, are based on a physician's professional judgment as to how to best serve that patient, uncorrupted by the prospect of obtaining a financial benefit from a third party.

6)      By conditioning the livelihood of its ER physicians on the extent to which they increase the number of ER inpatient admissions, defendants' practices corrupted the professional judgment of physicians servicing HMA hospitals and resulted in the provision of kickback-tainted medical services, as well as medically unnecessary services, paid for by Medicare, Medicaid and other health insurance programs.  Additionally, defendants' practice of requiring ER medical personnel to follow testing protocols resulted in the submission of false claims for kickback tainted and unnecessary tests. To date, defendants have submitted and caused the submission of false claims for kickback tainted services totaling hundreds of millions of dollars to Medicare, Medicaid and other Government insurance programs.

7)      Defendants are diverting scarce health care dollars into their own pockets by billing for many inpatient services that should be provided on an outpatient basis. Defendants are also endangering the patients they serve.  Hospitalization poses significant physical and

psychological risks to patients. The elderly are particularly susceptible to hospital-acquired infections, adverse drug reactions and hospital delirium; they should be hospitalized only when their medical needs cannot be adequately addressed elsewhere.

8)      Qui Tam Plaintiff Jacqueline Meyer ("Meyer" or "Relator Meyer") served as EmCare's Regional Client Administrator from September 2007 through January 2011.  She oversaw EmCare's ER practices at 20 HMA hospitals.  At HMA's insistence, in August 2010, EmCare removed Meyer from overseeing several of HMA's ER practices, after Meyer refused to follow HMA's directives to fire ER physicians and medical directors who admitted fewer patients than HMA wanted. Meyer was fired after she complained in writing to EmCare's compliance department about HMA and EmCare's conduct.

9)      Qui Tam Plaintiff Michael Cowling ("Cowling" or "Relator Cowling") worked for HMA from December 2006 to February 2009.  In April 2008, Cowling was promoted to HMA Division 1 Vice-President and CEO of Lake Norman Regional Medical Center ("LNRMC"), an HMA hospital in Mooresville, North Carolina.  Despite his outstanding annual performance review, Cowling was terminated by HMA after he refused to direct the ER physicians at LNRMC to base their hospital admission recommendations on HMA protocols designed to increase hospital admissions and, instead, directed the physicians "to do what you think is best for the patient."

10)     Qui Tam Plaintiffs Meyer and Cowling bring this civil action on behalf of and in the name of the United States of America ("United States") under the qui tam provisions of the federal False Claims Act, 31 U.S.C. §§ 3729-3733, and on behalf of and in the name of the state plaintiffs under analogous qui tam provisions in state false claims laws.

11)     Plaintiff Meyer also brings a civil action against the EmCare defendants and HMA on her own behalf, under the "whistleblower protection" provision of the federal False Claims Act, 31 U.S.C. § 3730(h).

12)     Plaintiff Meyer also brings a civil action against HMA on her own behalf for tortiuous interference with a business relationship under Florida common law.

## JURISDICTION AND VENUE

13)     Counts One through Three of this Complaint are civil actions by Relators, acting on behalf of and in the name of the United States, against defendants under the federal False Claims Act, 31 U.S.C. §§ 3729-3733.

14)     This Court has jurisdiction over Counts One through Three pursuant to 28 U.S.C. §§ 1331 and 1345, and 31 U.S.C. § 3732(a).

15)     Counts Four through Nine are civil actions by Relators, acting on behalf of and in the name of the state plaintiffs, against defendants under state false claims laws. This Court has supplemental jurisdiction over the claims brought on behalf of the state plaintiffs under 28 U.S.C. § 1367.  In addition, the Court has jurisdiction over the state law claims alleged herein under 31 U.S.C. § 3732(b).

16)     Count Ten is a civil action by Plaintiff Meyer, acting on her own behalf, against the EmCare defendants and HMA under the "whistleblower protection" provision of the federal False Claims Act, 31 U.S.C. § 3730(h). This Court has jurisdiction over Count Ten pursuant to 28 U.S.C. § 1331, and 31 U.S.C. §§ 3730(h) and 3732(a).

17)     Count Eleven is a civil action by Plaintiff Meyer, acting on her own behalf, against the defendant HMA under the common law of the State of Florida. This Court has supplemental jurisdiction over this claim under 28 U.S.C. § 1367.

18)     Defendants HMA, Newsome and EmCare transact business in this judicial

district.  In addition, Defendants HMA, Newsome and EmCare have violated the federal False

Claims Act in this judicial district as a result of the misconduct alleged herein.  Accordingly, this

Court has personal jurisdiction over the defendants, and venue is appropriate in this district.   31

U.S.C. § 3732(a); 28 U.S.C. § 1391.

19)     None of the transactions or allegations of defendants' violations of federal and

state False Claims Acts set forth in this Complaint is based on a public disclosure of allegations

or transactions in a criminal, civil or administrative hearing in which the Government or its agent

is a party, in a congressional, administrative or General Accounting Office report, hearing, audit

or investigation, or from the news media.

20)     Relators Meyer and Cowling are the original sources of and have direct and

independent knowledge of the information on which the allegations set forth in this Complaint

are based.  Moreover, prior to filing this lawsuit, Relators voluntarily provided the information

set forth herein to agents of the United States Department of Justice and the state plaintiffs.

## THE PARTIES

21)     Relator Jacqueline Meyer resides in Tampa, Florida.  She has a master's degree in

business administration and over 20 years of management experience in the health care industry.

From September 2007 through January 2011, Meyer served as a Regional Client Administrator

for EmCare, Inc., where she managed EmCare's ER practices under contract with various

hospitals, including HMA.  As a Client Administrator, Meyer oversaw EmCare's ER practices at

HMA hospitals in Florida, South Carolina, North Carolina, Pennsylvania, Alabama, and

Mississippi, including Fishermen's Hospital, Lower Keys Medical Center, Sebastian River

Medical Center, Charlotte Regional Medical Center, Lehigh Regional Medical Center,

7

Brooksville Regional Medical Center, Springhill Regional Medical Center, and Pasco Regional Medical Center in Florida; Carolina Pines Regional Medical Center, Upstate Carolina Regional Medical Center and Chester Regional Medical Center in South Carolina; Sandhills Regional Medical Center, Lake Norman Regional Medical Center, and Franklin Regional Medical Center in North Carolina; Carlisle Regional Medical Center, Heart of Lancaster Regional Medical Center, and Lancaster Regional Medical Center in Pennsylvania; Riverview Regional Medical Center and Stringfellow Memorial Hospital Center in Alabama; and Biloxi Regional Medical Center in Mississippi.

22)     Relator Michael Cowling resides in Palm Beach Gardens, Florida.  He is a certified public accountant who holds a master's degree in healthcare administration.  He has more than 20 years of management experience in the health care industry.  Mr. Cowling worked for HMA from December 2006 to February 2009.  From December 2006 until April 2008, Mr. Cowling served as CEO over Heart of Lancaster Regional Medical Center and Lancaster Regional Medical Center in Lancaster, Pennsylvania.  From April 2008 to February 2009, Mr. Cowling served as a Division Vice-President for HMA, where he was responsible for the administration of Lake Norman Regional Medical Center ("LNRMC") in Mooresville, North Carolina and Davis Regional Medical Center in Statesville, North Carolina.  Mr. Cowling also served as CEO of LNRMC during that time.

23)     The United States of America, acting through the Centers for Medicare and Medicaid Services ("CMS") of the U.S. Department of Health & Human Services ("HHS"), oversees the federal Medicare program and the joint federal-state Medicaid program, under which health care providers, including hospitals and physicians, may be paid with federal funds for providing inpatient and outpatient care.

24)     The States of Florida, Georgia, North Carolina, Oklahoma, Tennessee and Texas participate in the federal Medicaid program, under which hospitals and physicians may be paid with state funds for providing inpatient and outpatient care.

25)     Defendant HMA is a publicly traded corporation with over 35,000 employees, headquartered in Naples, Florida.  HMA's annual revenues as of Dec. 31, 2010 were $5.1 billion. HMA earned $150 million in profits during 2010, up 9 percent from 2009.  Through subsidiary companies operating under HMA's direction and control, HMA operates approximately 59 hospitals in 15 states: Alabama, Arkansas, Florida, Georgia, Kentucky, Mississippi, Missouri, North Carolina, Oklahoma, Pennsylvania, South Carolina, Tennessee, Texas, Washington and West Virginia. Approximately forty-one percent (41%) of HMA's net revenue comes from payments made by federal and state Governments under the Medicare and Medicaid programs.

26)     Defendant Gary D. Newsome was appointed President and Chief Executive Officer of HMA in September 2008.  He served in senior executive positions at HMA from 1993 to 1998.  Between 1998 and 2008, Newsome held senior executive positions with Community Health Services, Inc. ("CHS"), another for-profit hospital chain.

27)     Defendant Emergency Medical Services Corporation, a corporation headquartered in Dallas, Texas, had $2.9 billion in revenues in 2010.  Emergency Medical Services Corporation and its wholly-owned subsidiary defendant EmCare, Inc., are the leading providers of physician services for hospital emergency departments.  EmCare, Inc., directly or through its subsidiaries, contracts with hospitals in nearly 40 states to provide physicians and other staff for emergency departments.  HMA is one of EmCare, Inc.'s largest hospital clients.  Payments by Medicare and Medicaid constitute approximately 30% to 40% of EmCare's yearly revenues.

## LEGAL STANDARDS GOVERNING FEDERAL HEALTH CARE PROGRAMS

28)     Medicare is a federally funded health insurance program primarily for the elderly. Medicare was created in 1965 in Title XVIII of the Social Security Act.  Medicare has several parts, including:  Part A, the Basic Plan of Hospital Insurance, which covers the cost of hospital services and related ancillary services; and Part B, which covers the cost of physicians' services hospital outpatient services and other ancillary services not covered by Part A.

29)     Medicaid is a state and federal assistance program to pay for medical care for low-income patients.  Medicaid was also created in 1965 in Title XIX of the Social Security Act. Funding for Medicaid is shared between the federal government and those states participating in the program.

30)     TRICARE is a federally funded medical insurance program for military personnel, their spouses and unmarried dependent children under the age of 22, administered by TRICARE Management Activity pursuant to 10 U.S.C. §§ 1071-1107.

31)     Under Medicare Part A, hospitals submit claims for payment for inpatient services after the patient has been discharged from the hospital.  Initially, hospitals submit a patient-specific claim for interim payment for each discharged Medicare patient on Form CMS-1450, also called Form UB-04.

32)     Hospitals submit patient-specific claims for outpatient services under Medicare Part B.  Hospital services provided in the ER are considered outpatient services.  Medicare uses Ambulatory Payment Classifications ("APCs") to determine reimbursement rates for hospital outpatient services.  Under the APC system, outpatient services provided to a patient are assigned to a "classification" and reimbursed at a rate set by Medicare for that classification. More complex services are assigned to classifications with higher reimbursement rates.  The

number of diagnostic tests ordered may influence the classification of hospital outpatient services

provided in the ER, and hence the reimbursement rate.

33)     In addition to these interim patient-specific claims, hospitals annually submit

Form CMS-2552, commonly known as the Hospital Cost Report. 42 U.S.C. § 1395g(a); 42

C.F.R. § 413.20. The cost report is the provider's final claim for payment from the Medicare

program for the services rendered to all program beneficiaries for a fiscal year.  Medicare relies

on the Hospital Cost Report to determine whether the provider is entitled to more reimbursement

than already received through interim payments, or whether the provider has been overpaid and

must reimburse Medicare. 42 C.F.R. §§ 405.1803, 413.60 and 413.64(f)(1).

34)     Medicare reimburses physicians for their professional services under Part B of the

program, pursuant to a Physician Fee Schedule ("PFS"). 42 C.F.R. § 414.58(a). Physicians bill

Medicare for their examinations of patients in hospital ERs on a Form CMS-1500, using a

coding system known as a CPT (Current Procedural Terminology) coding.  ER physician

examinations are billed under one of five evaluation and management codes, depending on the

complexity of the examination.  The more complex the examination, the greater the

reimbursement. The number of diagnostic tests the physician reviews may influence the coding

of the physician's services, and hence the reimbursement rate.

<u>The Anti-Kickback Statute</u>

35)     The Anti-Kickback Statute ("AKS"), codified at 42 U.S.C.A. § 1320a-7b, was

initially enacted in 1972 to address congressional concern that payoffs to those who can

influence decisions about the purchase and delivery of health care goods and services will result

in goods and services being provided that are medically unnecessary, of poor quality, or even

harmful to a vulnerable patient population.  The AKS was designed to ensure that medical

decisions, including whether to treat a patient on an inpatient or outpatient basis, would be based on the provider's professional judgment as to how to best serve patients, rather than the provider's personal financial interests.  The AKS has been amended to strengthen its protections against kickbacks masquerading as legitimate transactions.

36)     The AKS prohibits the solicitation, receipt, offer, or payment of remuneration in return for referring an individual to a person for the furnishing of any item or service for which payment will be made in whole or in part under a federal health care program.  <u>See</u> 42 U.S.C.A. § 1320a-7b(b)(1)(B).  "Federal health care program" is defined to include any plan or program that provides health benefits funded directly, in whole or in part, by the United States Government.  <u>See</u> 42 U.S.C.A. § 1320a-7b(f).  This definition includes the Medicare, Medicaid, and TRICARE programs.

37)     The AKS, as interpreted by federal courts, prohibits the payment of remuneration where one purpose of the remuneration is to induce referrals.

38)     Federal regulations, codified at 42 C.F.R. 1001.952(d), identify certain narrowly defined financial transactions known as "safe harbors" that do not come within the prohibitions of the AKS.  Persons or entities relying on the safe harbor exceptions to avoid liability under the AKS have the burden of affirmatively proving their strict compliance with all conditions set forth in the statutory exceptions.  None of the activities identified as "safe harbors" apply when, as in this case, the compensation paid to doctors was tied to the value or volume of referrals of patients for inpatient admission. 42 C.F.R. 1001.952(d)(5).

39)     Compliance with the Anti-Kickback Statute is a necessary condition to the right of all health care providers, including hospitals and physicians, to receive or retain payments from the Medicare, Medicaid, or TRICARE programs. For example, in order for hospitals and

physicians to participate as Medicare providers and receive payment from the Medicare program, they must enter into Provider Agreements with CMS.  As part of that agreement, the provider must sign the following certification:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to [me]. The Medicare laws, regulations, and program instructions are available through the [Medicare] contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the [provider's] compliance with all applicable conditions of participation in Medicare.

Form CMS-855A; Form CMS-8551.

40)     Every Hospital Cost Report also contains a Certification which must be signed by the chief administrator of the provider or a responsible designee of the administrator. The certification page specifically provides that "if services identified in this report were provided or procured through the payment directly or indirectly of a kickback or were otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result."  The certification further provides: "I further certify that I am familiar with the laws and regulations regarding the provision of health care services and that the services identified in this cost report were provided in compliance with such laws and regulations."  CMS Form 2552 Hospital Cost Report. In other words, as a necessary condition for receiving Medicare funds, a hospital must certify that the services identified in its cost report were, in fact, provided in compliance with laws that include the AKS.  The Medicare program would not pay a hospital's claims for services provided in violation of the AKS.

41)     Similarly, to participate in Medicaid all medical providers must sign Medicaid enrollment agreements, which vary slightly from state to state, but generally certify that the provider will comply with all applicable federal and state laws and regulations.  See e.g. Fla.

Stat. § 409.907 (2011)**,** O.A.C. § 317:30-3-2 (2010).  By its very terms, the AKS is one of the

applicable federal laws governing the Medicare and Medicaid programs. In addition, several

states have enacted anti-kickback statutes that prohibit the payment of remuneration to induce

referrals. E.g. 55 Pa. Code § 1101.75 (2011).

42)     The TRICARE program is governed by regulations set forth at 32 CFR § 199 et

seq.  Section 199.9(c) describes conduct that would be considered "fraud" against the TRICARE

(formerly "CHAMPUS") program, stating in relevant part: (12) Arrangements by providers with

employees, independent contractors, suppliers, or others which appear to be designed primarily

to overcharge the CHAMPUS through various means (such as commissions, fee-splitting, and

kickbacks) used to divert or conceal improper or unnecessary costs or profits."  The TRICARE

program considers compliance with the Anti-Kickback Statute as a condition of payment.

43)     A claim that includes services resulting from a violation of the AKS constitutes a

false or fraudulent claim under the False Claims Act. 42 U.S.C. § 1320a-7b. Hospital Cost

Reports and claims contained on Forms CMS 1450 (or Form UB-04) and CMS 1500 are claims

for payment under the False Claims Act.

44)     Federal law and regulations require that any health care provider who furnishes

health care services that may be reimbursed under Medicare, Medicaid, or TRICARE must

ensure that, to the extent of his or her authority, those services are provided "only when, and to

the extent, medically necessary." (42 U.S.C.A. § 1320c-5(a); 42 C.F.R. § 1004.10.)  This

requirement makes the health care provider the "gatekeeper" who, through the exercise of his or

her unbiased medical judgment, plays a critical role in determining what services will be

reimbursed with federal funds.  If the gatekeeper's medical judgment is corrupted – for example,

by a hospital that conditions the award and renewal of physician services contracts, and

payments to physicians thereunder, on the physicians' success in achieving higher inpatient admission rates – then the federal health insurance system is at risk of paying for services that were not really medically necessary.  The AKS was enacted in response to this risk.

The Provision of and Reimbursement for Hospital Care

45)     Federal law and regulations require that any health care provider who furnishes health care services that may be reimbursed under Medicare, Medicaid, or TRICARE must ensure that, to the extent of his or her authority, those services are provided "only when, and to the extent, medically necessary."  42 U.S.C.A. § 1320c-5(a); 42 C.F.R. § 1004.10.

46)     When a patient visits a hospital's emergency room, he or she is examined by a physician who determines the patient's medical condition.  The physician must decide, based on the severity of the patient's condition and the expected course of treatment, whether the patient should be:  i) admitted to the hospital for inpatient treatment; ii) observed in an observation bed for a period typically lasting up to 24 hours but not exceeding 48 hours, after which time a decision can be made about whether the patient requires hospital admission; or iii) treated in the ER and discharged.

47)     The decision of whether to admit a patient, treat the patient in observation status, or discharge the patient has significant financial ramifications for the hospital.  Hospitals generally derive the bulk of their revenues from payments for inpatient care.  Hospitals are paid thousands of dollars more by Medicare to treat a patient who has been billed as an admitted inpatient than one who has been billed as an outpatient or as a patient under observation.

48)     The Medicare Program Integrity Manual provides that "[i]npatient care, rather than outpatient care, is required only if the beneficiary's medical condition, safety, or health

would be significantly and directly threatened if care was provided in a less intensive setting."

Chapter 6, Section 6.5.2.

49)     From a medical standpoint, it is especially important that physicians hospitalize

elderly persons <u>only</u> when inpatient treatment is essential to the well-being of the patient.

Hospitalization poses significant physical, psychological and emotional risks for the elderly.

Older people generally have more compromised immune systems and therefore are far more

susceptible to hospital-acquired infections.  Older adults also are more likely to experience

adverse drug reactions during hospitalization, because they are more susceptible to the side

effects of many drugs and are often treated with multiple medications.  Another serious risk

factor for the elderly is hospital delirium—a condition which according to the *American

Geriatrics Society* affects 1 in 3 hospitalized patients over age 70.  Patients who experience

hospital delirium usually have extended hospital stays and are at an elevated risk of being placed

in a nursing home, experiencing dementia or death.

50)     When patients are improperly admitted as inpatients rather than treated as

outpatients, the charges included in the hospital's interim payment claims and in cost reports are

unlawfully increased.

51)     Both the Medicare and Medicaid programs rely on physicians to exercise their

unbiased medical judgment in determining whether a patient should be hospitalized or treated on

an outpatient basis.  Even more fundamentally, patients and their family members put their trust

in treating physicians to make medical judgments, untainted by kickbacks offered by others who

may profit from the physicians' decisions, as to what treatment will best serve the needs of their

patients.  As detailed below, in order to increase corporate profits, defendants corrupted the

unbiased medical judgment of their ER physicians by conditioning physicians' continued

employment on the extent to which they increased the rate of hospital admissions.  Defendants'
practices violated Medicare and Medicaid rules and the most fundamental standards of clinical
care, all to the detriment of the patients defendants served and the taxpayers who bear the cost.

## DEFENDANTS' FRAUDULENT SCHEME TO INCREASE HOSPITAL ADMISSIONS

52)     Defendant HMA operates approximately 59 hospitals in rural communities in 15
states in the United States.  Approximately forty-one percent (41%) of HMA's net revenue
comes from payments made by federal and state Governments under the Medicare and Medicaid
programs.  Almost half of HMA's net revenue is from payments for inpatient care. Patients
visiting hospital ERs account for the majority of HMA's inpatient admissions.

53)     Like most hospitals in the United States, HMA hospitals do not hire physicians
directly to provide ER medical services.  Instead, HMA hospitals contract with other businesses,
including EmCare, Inc., to provide ER personnel and management services.

54)     With over 400 hospital contracts nationwide, EmCare, Inc. is the nation's leading
provider of ER physician services.  EmCare contracts with hospitals throughout the country to
staff hospital ERs.  EmCare also provides inpatient service physicians, known as hospitalists,
who manage hospital care for patients who do not have a personal physician to oversee their
inpatient care.

55)     Defendant HMA is EmCare's largest hospital customer.  HMA, through its
hospital subsidiaries, contracts with EmCare directly or through EmCare subsidiaries to receive
ER physician services at HMA hospitals.  Under its arrangement with HMA, EmCare bills and
receives payment from government insurers including Medicare and Medicaid, as well as private
insurers and individuals, for physician services provided at HMA hospitals.  Some HMA
hospitals also pay EmCare an additional "management fee" for servicing their hospital ERs.

17

56)     EmCare hires or subcontracts with emergency medicine physicians to provide professional services at HMA facilities.  EmCare pays its physicians an hourly rate for work performed at HMA facilities.  EmCare also employs physicians as medical directors at each HMA hospital ER it services.  EmCare pays its medical directors a monthly salary for their management services, as well as an hourly fee for clinical services they provide to hospital patients.  In addition, some HMA hospitals pay EmCare physicians and medical directors bonuses for meeting "performance standards" designed by HMA's corporate management to increase the rate of hospital admissions.

57)     HMA-EmCare contracts generally provide that:  1) the parties to the contract may terminate the contract with 60- to 90-days' notice without cause after the first year; and 2) the HMA hospital chief executive officer may direct EmCare to terminate any physician working at an HMA hospital at any time without cause.

58)     Plaintiff Meyer was hired by EmCare in September 2007 as a Client Administrator for the southeast region.  In that capacity, she managed EmCare's ER practices under contract with client hospitals, including HMA hospitals, in Alabama, Florida, South Carolina and North Carolina.  As an EmCare Client Administrator, Meyer worked directly with hospital administrators and corporate management to ensure that physician services were rendered to the satisfaction of the client.  In performing her duties, Meyer was in continual communication with HMA hospital CEOs and administrative staff and HMA corporate management, as well as EmCare physicians, medical directors and corporate management.

59)     In August 2009, Meyer was assigned to manage EmCare's ER practices at additional HMA hospitals, including HMA hospitals in Pennsylvania.

60)     Plaintiff Cowling was hired by HMA in December 2006 as the Chief Executive Officer of Heart of Lancaster and Lancaster Regional Medical Center in Lancaster, Pennsylvania.  In April 2008, he became HMA's Division Vice-President over Lake Norman Regional Medical Center ("LNRMC") and Davis Regional Medical Center.  He also served as the Chief Executive Officer of LNRMC during this time.  During his service as Division Vice-President and CEO, Mr. Cowling received management directives from the upper levels of HMA executive management, including HMA CEO/President Gary Newsome.

61)     While working for EmCare and HMA, respectively, Relators Meyer and Cowling independently discovered that HMA, at the direction of its highest corporate executives, including defendant Newsome, had devised an unlawful scheme to drive up the rate of hospital admissions from all HMA hospital ERs, without regard to medical necessity.  At various times over the last several years, Newsome and other HMA executives have implemented this scheme at all HMA hospitals throughout the United States.  HMA executed this scheme acting in concert with EmCare's corporate management.  Defendants' scheme has included the following elements:

62)     For each HMA hospital, HMA executives established a "corporate benchmark" rate for ER inpatient admissions.  These benchmarks were not based on an assessment of the medical needs of the patient mix at particular hospitals or the medical services that particular hospitals were equipped to provide to admitted patients.  Rather, the benchmarks were designed solely to boost hospital admission rates, irrespective of the medical needs of the patient population.

63)     For example, in calendar year 2008, the average ER admission rate for hospitals in the United States, including urban and rural hospitals, for patients 65 and older was 41%.

Because rural hospitals, as compared to urban hospitals, generally have fewer specialists and services to treat seriously ill patients, their ER inpatient admission rates tend to run far below the average combined ER inpatient admission rate for urban and rural hospitals.[1]

64)      Although HMA operates only rural hospitals, HMA executive management set a corporate-wide benchmark for ER inpatient admissions at each and every HMA hospital for visitors 65 and older at greater than (        50% -- knowing full well that this benchmark could only be met through unnecessary patient admissions.

65)      HMA's unrealistically high ER inpatient admission benchmarks were not just restricted to its elderly patient population.  Rather, HMA set benchmark admission rates for all its ER patients at rates designed to pressure doctors to admit patients who did not require hospitalization.  While the average admission rate in 2008 for ER patients at rural hospitals was 9.79%, HMA's targeted ER benchmark admission rates, which HMA provided to ER medical directors and doctors and EmCare corporate management, generally ranged from 16% to 20%.

66)      HMA set these high admission benchmarks despite the fact that most HMA hospitals lacked and continue to lack specialty care to treat many seriously ill patients.  For example, most HMA hospitals do not have level one or level two trauma centers to treat major trauma victims or 24-hour interventional cardiology, cardiac surgery, neurology, or neurosurgery services to treat heart attack or stroke victims.

67)      After setting targeted admission rates at levels that could only be met through unnecessary hospital admissions, defendants instituted a variety of corporate-wide practices at all HMA hospitals, as set forth below, to pressure HMA hospital CEOs, emergency room physician

---

[1] The national statistics cited in paragraphs 63 & 65 are derived from the Healthcare Utilization Project's ("HCUP") on-line query system based on data maintained by the Agency for Healthcare Research and Quality, the health services research arm of the U.S. Department of Health and Human Services. *See* http://hcupnet.ahrq.gov/ .

practice groups, and most importantly, the medical directors and physicians servicing HMA's ER patients, to meet these admission benchmarks.

68)    HMA corporate executives, including Newsome, directed hospital administrators to monitor ER admission rates through daily, weekly and monthly reports, generated by using a customized software program known as "Pro-Med."  For example, each HMA hospital generated a daily *Physician's Activity Report* that tracked for every ER physician:  1) the number of patients treated; 2) the number of patients admitted; 3) the percentage of patients admitted; and 4) the percentage of patients 65 and older admitted.  Individual HMA hospitals also tracked these same statistics on a daily, color-coded scorecard for each physician, with the color green signifying that the physician had met HMA's admission rate benchmarks, the color yellow signifying that the physician was close to meeting the benchmarks and the color red signifying that the physician had failed to meet the benchmarks.  HMA posted these scorecards in the physicians' shared workspace in order to exert peer pressure on physicians with "failing" admission grades.

69)    HMA's customized Pro-Med software also flagged every instance in which an ER patient may have met pre-programmed criteria for inpatient admission.  The criteria were intended by its developer to be used solely to guide hospital medical staff in screening patients and not as a substitute for medical decision-making.  Nevertheless, HMA used the criteria in conjunction with its customized Pro-Med software to coerce physicians to admit patients, regardless of the physician's clinical judgment about the patient's needs.  In order to discharge a patient who had been "flagged' for possible admission by the Pro-Med software, the ER physician was required to manually override the computerized designation ("admission overrides").  HMA corporate management tracked these overrides in the *Physician's Activity*

21

*Report* and gave failing grades to physicians whose admission override rates were 35% or greater.

70)    Newsome and other HMA corporate executives ordered HMA's hospital administrators, including hospital Chief Executive Officers ("CEOs"), Chief Financial Officers ("CFOs"), and Chief Operating Officers ("COOs"), to review physician admission rates and overrides as reflected in the *Physician's Activity Report*s during daily "flash" meetings with the ER physicians, and to interrogate them about so-called "missed" admissions.  The hospital administrators lacked medical credentials and were unqualified to assess the decision-making of the ER physicians and the quality of care provided.  The daily flash meetings were conducted with one purpose in mind—to pressure physicians to increase admissions and thereby increase hospital revenues.  During flash meetings, which were commonly referred to by the ER medical personnel as "daily inquisitions," hospital CEOs and their staff often overtly threatened the ER doctors and medical directors with termination if the physicians did not increase the number of patients they admitted.  Hospital CEOs, like Relator Cowling, who were unwilling to improperly interfere with ER physicians' clinical decision-making, were terminated.

71)    In addition to daily reports, HMA executive management also prepared and distributed monthly *Forced Rank Reports* to hospital CEOs and administrative staff, ER medical directors, and EmCare management.  In these monthly reports, HMA ranked all its hospital emergency departments according to ER inpatient admission rates.  Hospitals that met the corporate benchmark for the month, u.g.,    50% admissions for patients 65 and older, were grouped together above the benchmark line, while hospitals that failed to meet the benchmark were grouped below the line.

72)     Newsome and other HMA corporate executives used *Forced Rank Reports* and similar records to pressure hospital CEOs to increase their hospitals' ER admit rates.  HMA executives, including Newsome, warned hospital CEOs whose hospitals were below the admission benchmarks that they would be fired unless their admission rates rose.  Hospital CEOs in turn pressured EmCare management and medical directors to admit more patients and demanded that EmCare terminate ER medical directors and physicians who refused to "get with the program" of maximizing admissions. As will be discussed in more detail below, EmCare collaborated with HMA's efforts.

73)     HMA corporate executives also directed hospital CEOs and ER medical directors that patients were not to be placed in observation status even when medically warranted but, instead, were to be admitted as inpatients so that HMA could recover larger fees for their care. For example, in an August 11, 2008 email to HMA Senior Vice-President Stan McLemore, HMA Division 4 President Dale Armour recounted instructions he and EmCare's Chief Medical Officer gave to all Division 4 ER medical directors.  These instructions were to disregard communications from primary care physicians and case managers to place patients in observation status and to admit them instead. McLemore disseminated this email to all Division CEOs, with instructions to follow suit.

74)     Newsome and HMA executive management developed other techniques and incentives to unlawfully induce ER physicians to increase hospital admissions.  HMA implemented a Pro-Med software program that identified a series of diagnostic tests to be immediately performed, according to what the triage nurse had specified as the patient's chief complaint, before the patient had been seen by a doctor.  As described more fully in paragraph 122 below, Newsome boasted that these testing protocols were "designed to drive admissions."

23

The testing protocols resulted in unnecessary testing, and higher hospital and physician charges paid for by Medicare and Medicaid.  HMA management instructed physicians to keep testing patients until they could come up with a reason to admit them.

75)     HMA also established a protocol requiring ER doctors to order     85% of the tests specified in the protocol, despite the fact that in many instances the tests were medically unnecessary.

76)     HMA tracked its physicians' compliance with these testing protocols on a daily basis, using the same reports it used to track admission rates.  Similarly, hospital administrators interrogated individual physicians who deviated from the testing protocols at daily flash meetings.  Physicians who insisted on exercising their independent medical judgment on how to treat their patients and refused to order tests that they deemed were medically unnecessary were first reprimanded, and then terminated, by EmCare at HMA's direction.

77)     HMA also instituted benchmarks for calls from ER physicians to primary care physicians.  Because ER physicians generally do not have admitting privileges at hospitals, a patient's primary care physician or other attending physician must authorize the patient's hospital admission.  As a general matter, primary care physicians tend to defer to the admission recommendation of the ER physician, who has the most up-to-date knowledge of the patient's condition.  Primary care physicians who are seeing patients in their offices or are otherwise away from the hospital when called by an ER physician will seldom reject an ER physician's recommendation that a patient be hospitalized until she can be seen by the primary care physician.  For this reason, and in order to maximize admissions, HMA established a benchmark that required ER physicians to call primary care physicians     85% of the time for patients 65 and

older.  For younger patients, ER physicians were to contact primary care doctors    35% of the time.

78)     HMA instructed ER physicians and EmCare management that the purpose of these calls was not to obtain a better understanding of patients' medical needs but, rather, to "sell admissions" to primary care physicians.  In those instances where a physician's admission rates fell below corporate expectations, HMA directed EmCare management, including Relator Meyer, to train the ER physician on how to sell admissions during telephone calls with primary care physicians.  Defendants told ER physicians not to solicit the primary care physician's advice but instead to tell the physician that the patient should be admitted.  Defendants further directed ER physicians to inform a patient's primary care physician that if he or she would not authorize the admission, the ER physician would require the primary care physician to come to the ER to personally discharge the patient.

79)     HMA corporate and hospital executives tracked and reviewed individual ER physicians' compliance with HMA's benchmarks for telephone calls to primary care physicians on a daily basis in the same manner that they tracked compliance with other ER benchmarks.

80)     HMA also used monetary bonuses to unlawfully induce ER physicians to increase the rate of hospital admissions.  At targeted hospitals, HMA contracted with EmCare and other ER physician practices to pay bonuses to physicians who exceeded benchmarks designed to maximize admissions.  For example, HMA paid ER doctors and medical directors monthly bonuses for exceeding benchmarks for calling primary care physicians and for ordering tests specified by HMA's testing protocols, and for staying below benchmarks for admission overrides.  As HMA intended, these bonus plans resulted in increases in hospital admissions.  Similarly, admission rates dropped when HMA terminated bonus plans.

81)     EmCare actively assisted HMA in unlawfully pressuring and inducing ER medical directors and physicians to sacrifice their medical judgment and recommend the hospitalization of ER patients and the ordering of diagnostic tests, irrespective of the medical needs of the patients. EmCare's participation and assistance included the following:  a) in overseeing its ER medical directors and physicians, EmCare enforced HMA's corporate benchmarks for ER inpatient admissions, diagnostic testing, calls to primary care physicians, and admission overrides; b) EmCare entered into contracts with HMA under which HMA paid bonuses to ER directors and physicians who met HMA's corporate benchmarks designed to increase admissions; c) EmCare trained its physicians to "sell admissions" in telephone calls to primary care physicians, rather than engage in a meaningful consultation about the patients' medical needs; d) EmCare management instructed ER medical directors and physicians to admit more patients and to adhere to the testing protocols; e) EmCare, at HMA's request, threatened to terminate, and actually terminated, ER medical directors and physicians who refused to follow HMA's unlawful procedures to maximize admissions and increase diagnostic testing; and f) EmCare fired its own corporate managers who refused to be a party to HMA's illegal actions.

82)     The following are specific examples, based on Meyer's and Cowling's knowledge and experiences working for EmCare and HMA, respectively, of the defendants' corrupt practices to unlawfully induce physicians to boost admissions and diagnostic testing at HMA hospitals throughout the United States.

Chester Regional Medical Center

83)     Chester Regional Medical Center ("Chester Regional") is an 82-bed hospital in Chester County, South Carolina, operated by HMA since 2004.  HMA contracts with EmCare to provide emergency medical services at Chester Regional.

84)     In June 2009, Plaintiff Meyer was assigned to oversee EmCare's ER contract at Chester Regional.  At the time, Chester Regional's CEO was Craig Walker and its CFO was Skip Smith.

85)     Chester Regional offers limited medical services and cannot treat many major illnesses.  For example, the hospital does not offer in-patient dialysis, obstetrics, urology, pulmonology, or ENT services.  Chester Regional is also within 45 miles of Charlotte, North Carolina and 65 miles of Columbia, South Carolina, where there are major university medical centers offering a full array of inpatient services.

86)     When Relator Meyer assumed oversight responsibility for the Chester-EmCare contract, Chester Regional's ER admission rate was on par with most small rural hospitals, fluctuating between 8% and 12%.

87)      Hospital CEO Walker and CFO Smith informed Meyer that they recommended to corporate management that the hospital's internal budget should include a 12% projected ER admission rate—an aggressive figure in light of Chester's limited inpatient services.  According to Walker and Smith, HMA Division Vice-President Angela Marchi ignored their recommendation and budgeted Chester Regional at an 18% ER admission rate.  HMA set its admission rate for patients 65 and older at    50%.

88)     CEO Walker and CFO Smith confided in Meyer that the ER admit rates set by HMA corporate management were "ridiculous," but that they feared they would be fired if they did not drive up ER inpatient admissions.  As set forth in paragraph101 & 104 below, their fears proved to be well-founded.

89)     As set forth in paragraphs 68 & 71 above, HMA utilized daily *Physician's Activity Reports* and monthly *Forced Rank Reports* to constantly monitor admission rates and to coerce Chester's ER medical director and physicians to admit more patients.

90)     Immediately after Meyer assumed responsibility for the Chester Regional contract, CEO Walker began complaining to her that the EmCare ER medical director in charge at the time was not raising admission rates.  In September 2009, CEO Walker ordered Meyer to fire the ER medical director because he had not "influenced" Chester's ER physicians to admit more patients.  Meyer complied with Walker's order – but only because she found the director's performance to be deficient in other respects.

91)     In or about February 2010, EmCare hired Dr. Michael Rowe, a well-respected, board-certified emergency medicine physician, as the new ER medical director for Chester Regional.  Dr. Rowe worked diligently to improve the quality of care at Chester Regional and to expand its services.  Dr. Rowe took on new initiatives to raise the hospital's profile in the community, including holding education workshops for paramedics and assisting the hospital in its efforts to obtain accreditation for its stroke center.

92)     HMA corporate management paid scant attention to Dr. Rowe's initiatives and accomplishments.  Instead, HMA focused almost entirely on Chester's admission rates—and on pressuring Rowe and his physicians to increase the rate of ER inpatient admissions.  HMA hospital administrators conducted daily flash meetings with Rowe and his staff in which administrators with no medical credentials grilled the doctors on the previous day's admission decisions.  Several hospital administrators reviewed patient charts on a daily basis for "missed opportunities."

93)     EmCare's Vice-President of Client Administration Steve Bartow occasionally listened in on these flash meetings by telephone.  Dr. Rowe repeatedly complained to Vice-President Bartow, both orally and in writing, about HMA's relentless pressure to increase admission rates, irrespective of medical necessity.  Although Bartow told Rowe that HMA's conduct was improper and professed sympathy for Rowe's predicament, he took no action to correct the situation.

94)     Dr. Rowe also spoke to Relator Meyer about HMA's pressure to increase the number of admissions and inquired as to whether HMA's behavior was typical of the way in which other hospital chains conducted themselves.  Meyer informed him that none of her other hospital clients behaved in a similar manner.

95)     Dr. Rowe also complained about HMA's pressure tactics to Dr. Michael Wheelis, who at the time was EmCare's Chief Medical Officer for HMA's facilities. (HMA subsequently hired Dr. Wheelis away from EmCare as an HMA Division Chief Medical Officer.)  Wheelis acknowledged that, under Dr. Rowe's direction, Chester Regional was a leader in its division in several quality of care metrics, but that the only "number" HMA cared about was the admission rate.

96)     HMA utilized other tactics to try to increase admissions at Chester, as described in paragraphs 62 through 80 above, including directing ER physicians to comply with testing protocols more than 85% of the time.  Dr. Rowe resisted performing or ordering other physicians to perform unnecessary medical tests.  He told HMA hospital administrators that he and his staff would only order tests that they deemed medically necessary, irrespective of the testing protocols.

97)     HMA Division 1 President Britt Reynolds, Vice-President Angela Marchi, and CFO Chris Hilton participated in telephone calls with hospital CEO Walker and CFO Smith and, on occasion, with Dr. Rowe, in which they warned Smith, Walker and Rowe that they were going to make personnel changes at Chester if the ER admission rates did not go up.

98)     In or about October 2010, Page Vaughan, a HMA Senior Vice-President, arrived at Chester Regional to "straighten out" the situation.  Vaughan told Rowe that he was in direct communication with Newsome (to whom Vaughan and all other division presidents directly reported).  Vaughan said that, according to Newsome, Chester's ER admit rates needed to change, and if changes were not made on the admissions side, personnel changes would be made at Chester.

99)     In or about December 2010, CEO Walker and his staff presided over a particularly hostile flash meeting with Dr. Rowe, part-time ER physician H. Singh and others, in which the hospital administrators repeatedly challenged the medical decisions of the ER doctors. The doctors, in turn, challenged the administrators for interfering with their medical judgment. Following the meeting, Dr. Rowe told CEO Walker, in the presence of Dr. Singh, that he was not going to ask his physicians to do anything illegal, unethical or immoral, despite HMA's demands that he do so.  Dr. Rowe further accused Walker of practicing medicine on Rowe's license.

100)    Following this meeting, HMA Senior Vice-President Vaughan requested that Dr. Michael LoGuidice, an EmCare Regional Medical Director in Florida, report to Chester to work with the ER physicians to improve "quality of care."  In his discussions with and review of the ER physicians' performance, Dr. LoGuidice focused entirely on improving admissions.  For example, Dr. LoGuidice instructed the ER physicians on the manner in which they should present their admission recommendations to attending physicians to ensure approval.  He told the

physicians not to discuss their recommendations with the attending physicians but, rather, to simply tell the attending physician that the ER physician wanted the patient admitted.

101)    In January 2011, Vaughan fired CEO Walker.  Vaughan took over as CEO of Chester Regional.

102)    In a February 2011 email, Dr. Rowe informed EmCare Vice-President Bartow that he wanted to resign as medical director but continue working as an ER physician at Chester Regional.

103)    A few days later, pursuant to HMA's direction and without further explanation, EmCare terminated Dr. Rowe's employment both as medical director <u>and</u> ER physician.

104)    That same month, HMA terminated CFO Smith.

Carolina Pines Regional Medical Center

105)    Carolina Pines Regional Medical Center ("Carolina Pines") is a 116-bed hospital in Hartville, South Carolina, operated by HMA.  In 2007, HMA contracted with EmCare to provide emergency medical services.  Relator Meyer oversaw the HMA-EmCare contract for Carolina Pines.

106)    In early 2009, Carolina Pines CEO Lance Jones contracted with EmCare to pay several thousand dollars in monthly bonuses to ER physicians and ER medical director Dr. James Balvich for exceeding corporate benchmarks, including, <u>inter</u> <u>alia</u>, benchmarks for calling primary care physicians and for ordering all tests specified in the testing protocols.  Not surprisingly, ER physicians increased their admission rates once the bonus plan was implemented.

107)     After the implementation of the bonus plan, Dr. Abraham Areepanthu, Carolina

Pines' chief of staff and medical director of the hospitalist program, repeatedly complained to

Meyer that the ER physicians were admitting patients who did not require hospitalization.

108)     In April 2010, CEO Jones terminated the bonus plan and fired ER medical

director James Balvich for reasons unrelated to ER inpatient admissions.  The ER admission

rates dropped dramatically, from around 20% to 11%.

109)     In May 2010, Dr. Michael Rowe, the ER medical director of Chester Regional,

became interim ER medical director at Carolina Pines.

110)     After Dr. Rowe took over as medical director, HMA Division 1 corporate

management, including Division President Britt Reynolds and Vice-President Angela Marchi,

flew from Naples, Florida, to meet with Carolina Pines' hospital administrators and medical

staff, including Rowe and his ER physicians, as well as the hospitalists and internists.  Relator

Meyer participated in the meeting by telephone.

111)     At the meeting, Reynolds and Marchi directed the physicians to admit patients

rather than place them in observation status.  They explained that the hospital earns only a few

hundred dollars when a patient is placed in observation, while it earns several thousands of

dollars when a patient is admitted.  Reynolds and Marchi stated that if a patient needs to be in the

hospital, he or she must be fully admitted.  At the time of the meeting, a newly hired HMA case

manager had been challenging HMA's practice of admitting patients whose needs could be

addressed in observation status.

112)     Reynolds and Marchi also directed the medical staff to call the primary care

physicians to get any information they could to justify an admission, and to keep testing their

patients until they found a reason to admit them.  As Reynolds put it, the doctors were to use the

testing protocols to "fish 'til you catch."  He explained, "If you run enough tests on someone, you'll find some reason to admit him." Marchi told the group that they were to contact as many people as possible, including the primary care doctor and any other medical personnel available, to obtain any and all information that could support an admission.

113)    Following this meeting, Dr. Rowe wrote an email to the meeting participants summarizing HMA's directive to the ER physicians, hospitalists and case managers to work together to come up with reasons to admit more patients.  Marchi was irate that Rowe had put this in writing and refused to have further contact with him.

114)    Shortly after the meeting, Dr. Rowe resigned as medical director of Carolina Pines.

115)    On several occasions, Carolina Pines CEO Jones asked Meyer to terminate ER physicians Paul Alexander and Jean Kohn because they were not admitting enough patients. Prior to Dr. Rowe's resignation, Jones also asked Meyer to fire Dr. Rowe, because he had not increased the admit rate.  Meyer did not comply with these requests.

116)    In August 2010, HMA demanded that EmCare remove Meyer from all Division 1 HMA accounts, including Carolina Pines.  EmCare complied.

117)    In November 2010, HMA terminated its contract with EmCare at Carolina Pines because its physicians had failed to raise the admission rates as HMA had directed.

Lake Norman Regional Medical Center

118)    Lake Norman Regional Medical Center (LNRMC) is a 123-bed hospital in Mooresville, North Carolina owned and operated by HMA.  Davis Regional Medical Center ("Davis") is a 131-bed hospital in Statesville, North Carolina owned and operated by HMA. Both hospitals lack trauma centers and do not perform cardiac surgeries or cardiac

catheterizations.  They also are within 40 miles of Charlotte, North Carolina, where there are major hospitals offering a full array of medical services.

119)     In April 2008, HMA selected Relator Cowling to be the Division Vice-President and Vice-President of the Region, with responsibility for both LNRMC and Davis.  Cowling also was appointed to serve as CEO of LNRMC.   At the time Cowling was selected, Mid-Atlantic Emergency Medical Associates ("MEMA"), a local physician emergency medicine practice group, operated and staffed the ER in both hospitals.

120)     Shortly after Cowling assumed responsibility for LNRMC and Davis, HMA executives began pressuring him to increase the number of ER inpatient admissions.  In a July 11, 2008 memo, Kelly Curry, HMA's Chief Operating Officer (COO), directed all HMA hospital CEOs, including Cowling, to "make unannounced visits to your hospital Emergency Rooms this weekend."  The purpose of these unannounced visits, according to Curry, was to "afford each of you the opportunity to see firsthand what is taking place in the ER and to speak with the physicians on duty to assure that all appropriate measures are in place to deal with the ProMed report findings."

121)     In September 2008, HMA hired Gary Newsome as its President and CEO. Newsome had previously served as a Division President for Community Health Systems ("CHS"), a for-profit hospital chain that is currently under federal and state investigation for its ER admission practices.  To increase corporate profits, Newsome escalated the pressure on HMA hospital administrators, ER physicians, and EmCare management to admit more ER patients.

122)     Shortly after his appointment as HMA President/CEO, Newsome flew to North Carolina to make a presentation to Mr. Cowling and his management team.  During the presentation, Newsome informed Cowling that he "need[ed] LNRMC to be one of the leaders in

emergency room volume growth." Newsome stated that he was implementing ER testing protocols to "drive admissions" at HMA hospitals, as he had done during his tenure at CHS. Adherence to the testing protocols, according to Newsome, would increase both the number of tests run on patients and the number of ER inpatient admissions.

123)     In or about October 2008, Cowling attended an HMA seminar for hospital CEOs in Orlando, Florida.  At the meeting, HMA executives, including Newsome, explained the protocols and promised that when implemented, the protocols would drive up ER inpatient admission rates.  The hospital CEOs were told that the protocols had been customized for HMA with Newsome's input.  Newsome directed HMA hospital administrators to regularly review ER logs and Pro-Med reports and talk to their ER physicians about their decisions to admit or discharge patients.  Cowling was alarmed that HMA executives were directing hospital administrators with no medical training to review and evaluate the medical decision-making of their physicians.  Based on his 20-plus years in the health care industry, Cowling knew that it was inappropriate for administrators to attempt to influence the medical decisions of hospital physicians.

124)     In an October 20, 2008 email following the Orlando meeting, HMA COO Kelly Curry wrote to all the hospital CEOs, with a copy to Newsome and other HMA executives: "I am sure you left Orlando with the same excitement and anticipation of the available opportunities in the ER, as I did!"  Curry again directed the CEOs to review Pro-Med ER reports, including the *Physician's Activity Report*, over-65 admit report, attending called report, and admission override report. Curry made no pretense that the Pro-Med reports were designed to promote quality of care in the ER.  Instead, he proclaimed:

These [reports] are the key to unlocking the revenue potential as shown to you by the Promed staff.  By the way, these figures were based on $5,000 of net revenue per case, substantially lower than our actual.

………

The effective review and action on [these reports] could make your [budget] plan for this year.  It will definitely make it next year.

125)     Mr. Cowling presented Newsome and Curry's directives and the HMA testing protocols to MEMA, the ER physicians at LNRMC and Davis.  After analyzing the protocols, the MEMA physicians concluded that their implementation at LNRMC would result in medically unnecessary tests and hospital admissions.  They told Mr. Cowling that the HMA's directives were clinically wrong, and that legal counsel with whom MEMA consulted had advised the physicians that the procedures they were being told to follow were fraudulent.

126)     Cowling relayed this conversation to Newsome; Britt Reynolds, HMA's Regional President; and Vicki Briggs, an HMA Divisional Vice-President.  Cowling explained that his doctors had concluded that adherence to the protocols would result in medically unnecessary tests and admissions. Cowling told Newsome, "My docs won't do it."  Newsome responded, "Do it anyway."

127)     Cowling met again with the MEMA physicians.  The physicians reaffirmed their conviction that HMA's directives were fraudulent and asked Cowling what they were supposed to do.  Contrary to Newsome's instructions, Cowling replied, "I have been told that these directives have to be implemented, but I'm telling you, you have to do what you think is right for the patient."

128)     Over the remaining months of Mr. Cowling's tenure with HMA, corporate management continued to push him to raise the number of hospital admissions.  HMA increased LNMRC's budgeted admission rate for FY 2009, despite the fact that there was no change in the services of LNMRC offered or the demographics of the patient population it served.  Cowling

36

and LNRMC CFO James Stoner objected to this arbitrary increase in the hospital's budgeted admission rate -- an increase that could be achieved only through unnecessary admissions.  In a November 7, 2008 email to HMA Division 1 CFO Chris Hilton, Stoner wrote, "Chris - based on our ED reviews, I am not comfortable with an increase of 1 point on our ED admit rate percentage.  We are just not seeing that many 'missed' admissions."

129)    In a December 5, 2008 email, HMA Division 1 CFO Chris Hilton wrote Cowling that he was "a long way from the budgeted 14.5% ER admit rate for 2009."  Cowling responded that he had told corporate management at the budget meeting for LNRMC that there "was no way to get [the admission numbers] they wanted."  Cowling continued, "I look at all of these [admission reports] each day.  I do not see anything we are not admitting that should be admitted."

130)    In a December 29, 2008 email to all HMA hospital CEOs, CFOs, and CNOs, Hilton directed the hospital administrators to submit daily reports that were to include summaries of "discussion points with ER physicians/staff concerning Pro-Med quality indicators [e.g. admit rates, use of testing protocols, and calls to primary care physicians] as this should be a daily 'rounds' discussion item."

131)    In his first year as CEO of LNRMC, Cowling came within 97% of making full budget.  Cowling received an outstanding performance evaluation.  Three weeks later, HMA fired him without explanation.  The only criticism that Cowling ever received from HMA corporate management was that he had failed to meet the budgeted ER admission numbers.

132)    After Cowling's termination, Dr. Michael Wheelis, at the request of Division 1 Vice-President Marchi, met with the MEMA physicians and reviewed charts for LNRMC's ER patients to assess MEMA's performance and determine if they were discharging patients who

should have been admitted. Dr. Wheelis reported to Meyer that MEMA was one of the most professional groups of doctors he had ever worked with and that he had not uncovered any quality concerns or "missed admissions."

133)    Nevertheless, HMA terminated MEMA's ER contract and awarded it to EmCare. Meyer was told by several EmCare corporate managers that HMA discharged MEMA because their admission rates were too low.  HMA also awarded EmCare a contract to provide hospitalists for LNMRC.  EmCare represented during sales meetings with hospital CEOs that contracting with EmCare to provide both ER physicians and hospitalists would result in higher admissions because EmCare hospitalists would not turn down admission requests from its EmCare ER physicians.

Carlisle Regional Medical Center

134)    Carlisle Regional Medical Center ("Carlisle") is a 165-bed hospital located in Carlisle, Pennsylvania.  HMA, through a subsidiary, purchased Carlisle in 2001.  HMA contracts with EmCare to staff Carlisle's ER.

135)    While Carlisle offers a solid complement of routine specialty care, it is not a trauma center and does not provide interventional cardiac catheterization. Carlisle is located within a short drive of Hershey Medical Center, a major university hospital.

136)    Dr. Anthony Guarracino served as Carlisle's ER medical director.  He is a well-respected emergency medicine physician and a member of the American Osteopathic Board of Emergency Medicine.

137)    In or about August 2009, Relator Meyer was assigned to oversee EmCare's ER contract at Carlisle.

138)    Within a month of assuming responsibility for the Carlisle-EmCare contract,
Meyer attended a meeting at Carlisle that included the following EmCare managers and
employees:  Dr. Frank Biondolillo, Executive Vice-President for EmCare's southeast region; Dr.
Michael Wheelis, EmCare's Chief Medical Officer for HMA's facilities; ER medical director
Anthony Guarracino; ER assistant medical director Dr. Cliff Cloonan; and Carlisle's ER
physicians.

139)    At the outset of the meeting, Dr. Biondolillo announced, "If you want to be
successful at an HMA hospital, you are going to have to admit more patients."  Dr. Cloonan
angrily responded that Dr. Biondolillo was not going to make him break the law and that
Cloonan was going to do what was right for the patient.  Dr. Cloonan added that he was not
going to admit patients just to make HMA money.  Other ER physicians and medical personnel
in attendance, including Dr. Patricia Frierson and Dr. Laura Krim, expressed support for Dr.
Cloonan's stated position.

140)    After the meeting, the EmCare managers told Carlisle CEO John Kristel what had
transpired.  In response, Kristel told the EmCare group to fire Dr. Cloonan because he "was not
on board," "was not with the program," and "was not supporting our goals."  Meyer warned
Kristel that Cloonan might file a lawsuit if he were fired and suggested that EmCare and HMA
consult with their respective legal departments.

141)    Kristel did not back away from his efforts to pressure the ER physicians into
admitting more patients.  During telephone calls and in-person meetings, Kristel told Meyer that
members of HMA corporate management, including HMA Division 1 Vice-President Angela
Marchi, were warning him that if Carlisle did not achieve a 20% admit rate, HMA would fire

him.  Kristel instructed Meyer to get the EmCare doctors to admit more patients immediately, because Marchi wanted the admit rate to go up "overnight."

142)    Meyer again sought to convince Kristel not to interfere with the ER physicians' medical decision-making.  She told him that it was illegal to pressure physicians to admit patients and that they all could be sued for doing so.  Kristel responded, "I would rather be testifying in court than telling my wife I just lost my job."

143)    During a telephone conversation with Meyer, Kristel complained about an encounter he had had with Carlisle ER physician Cloyd Gatrell.  Kristell was in the ER when Dr. Gatrell was treating a 97-year-old nursing home resident.  Kristel told Dr. Gatrell, "Find a reason to admit this guy, he's 97, there's got to be something wrong with him."  Dr. Gatrell refused.  He told Kristel that the patient did not need hospital care and that he intended to return him to his nursing home.

144)    On numerous occasions Kristel told Meyer that EmCare had to get rid of Cloonan and Gatrell.  He also told Meyer that HMA Division 1 Vice-President Marchi wanted to get rid of ER medical director Anthony Guarracino because the ER admission rate was "too low," and Dr. Guarracino was not pressuring physicians to admit more patients.

145)    In or about June 2010, HMA contacted Dr. Terry Meadows, EmCare's CEO for the southeast region, and demanded a meeting at Carlisle.  The meeting was held on or about July 9, 2010.  Kristel, Meadows, Wheelis, EmCare nurse Brenda McCarthy, Meyer and other EmCare hospital division executives attended the meeting.

146)    Kristel instructed the EmCare attendees that HMA wanted EmCare to "clean house" and get rid of all the ER physicians because they were not admitting enough patients. The EmCare attendees agreed to fire two physicians every two months.  Meadows and Wheelis

assured Kristel that they had warned Dr. Guarracino the previous evening that the continued

employment of Dr. Guarracino and all the Carlisle ER physicians would be in jeopardy if Dr.

Guarracino did not raise the admission rate. Kristel reiterated that he wanted Carlisle's ER

inpatient admission rate to rise to 20% immediately.

147)   In July 2010, EmCare fired Dr. Gatrell.  EmCare was preparing to fire Dr.

Cloonan when he was injured in a traffic accident in August 2010 and left Carlisle.

148)   In late July or early August 2010, Meadows ordered Relator Meyer to tell Dr.

Guarracino that he had to call his ER physicians every day to get them to admit more patients or

they would all be fired.

149)   Meyer did not comply with his instructions.  Instead, she told Dr. Guarracino that

they were all under a great deal of pressure and asked him to keep a daily written record of the

reasons underlying the admission decisions of his ER physicians.

150)   The following day, Meadows asked Meyer if she had conveyed his message to

Dr. Guarracino.  Meyer told him she had not and repeated what she had told Guarracino.

151)   Meadows then called Dr. Guarracino himself and delivered the "admit or be

fired" ultimatum.

152)   In or about September 2010, EmCare forced Dr. Guarracino from his position as

medical director of Carlisle's ER.

153)   On August 16, 2010, Steve Bartow, Meyer's boss, stripped Meyer of all

responsibility for EmCare's contracts with HMA Division 1, including its contracts with Carlisle,

Lancaster Regional, Heart of Lancaster, Lake Norman, Chester, Carolina Pines, Sandhills,

Stringfellow and Riverview hospitals.  Bartow told Meyer that HMA had insisted that she be

removed from these contracts because HMA had "lost confidence" in Meyer.

154)     In an e-mail four days later, Meyer set forth her concerns about defendants'
fraudulent practices to EmCare's compliance department.

155)     On October 7, 2010, less than two months after Meyer refused to deliver Dr.
Meadow's "admit or be fired" ultimatum to Dr. Guarracino, HMA placed Meyer on a
Performance Improvement Plan ("PIP").  Up until that point, Meyer had a spotless employment
record.  Meyer's supervisor, Steve Bartow, began drafting a letter to Meyer notifying her that she
was being placed on a PIP within three days of Meyer's refusal to unlawfully pressure Dr.
Guarracino to admit more patients.

156)     In the October 17, 2010 PIP notification, Bartow wrote that a number of clients
had complained that Meyer did not respond to their needs and as a result, her reputation with
these clients had been damaged. Bartow refused to provide any specifics.  With the exception of
one account, all of Meyer's clients at the time were HMA hospitals.

157)     On October 24, 2010, Meyer sent Bartow a written response to the PIP.  Meyer
stated that she believed that any client complaints arose from the fact that Meyer would not
pressure physicians to admit patients.  Meyer wrote:

> Our clients demand that we improve the admit rate, including by terminating
> physicians or medical directors who don't admit patients to their satisfaction…. I
> feel that my reluctance when asked to terminate Dr. Guarracino at Carlisle, and
> my reluctance when asked to compel the Carolina Pines physicians to admit more
> patients explains the client's criticism, and it is unfair.  **I have expressed my
> concerns that demands for higher admits without a medical need, or "soft
> admissions" is unlawful.** (Emphasis added.)

158)     Under the PIP, Meyer was required to meet with Bartow every two weeks to
"review [Meyer's] performance as it relates to this performance improvement plan."  After
approximately two meetings, Bartow stopped meeting with Meyer.

159)     After EmCare removed HMA's Division 1 accounts from Meyer's oversight,

Meyer was left with approximately half of her normal workload. EmCare failed to respond to

Meyer's continual requests for more work.

160)     In January 28, 2011, EmCare fired Meyer.  Steve Bartow told Meyer that she was

terminated because she was not inputting her notes into the company's note-saving software

program and because she was "too involved" in clinical issues. Meyer was escorted from the

premises.  She was not permitted to take anything from her office other than her purse.  After she

left, EmCare packed Meyer's personal possessions and shipped them to her.

Lancaster Regional Medical Center

161)     Lancaster Regional Medical Center ("Lancaster Regional") is a 214-bed hospital

located in Lancaster, Pa.  HMA, through a subsidiary, acquired Lancaster Regional in 2000.

HMA contracts with EmCare to provide ER personnel and management services. Relator

Cowling served as CEO over Lancaster Regional from December 2006 until April 2008, before

HMA began to unlawfully pressure the ER physicians at Lancaster Regional to increase ER

admission rates.

162)     Lancaster Regional is located within a few blocks of Lancaster General Hospital,

the largest hospital in Lancaster County.  Many physician specialists choose to practice

exclusively at Lancaster General.  For example, in May 2006, the Heart Group, a group of 15

cardiologists, left Lancaster Regional and entered into an exclusive contract with Lancaster

General.

163)     In or about August 2009, Relator Meyer was assigned to oversee EmCare's ER

contract at Lancaster Regional.  By this time, HMA had instituted many of the processes and

procedures at Lancaster Regional that HMA was using at other hospitals to pressure and induce

43

physicians to raise ER admission rates.  These practices included: setting unrealistically high target admission rates that physicians were pressured to reach; holding flash meetings to interrogate physicians about "missed admissions"; and monitoring adherence to corporate benchmark rates for telephone calls to primary care physicians, testing protocols, and admission overrides.

164)    HMA also contracted with EmCare to pay monthly bonuses to ER physicians and medical directors for exceeding corporate benchmarks designed to increase admission rates, including, *inter alia,* for calls to primary care physicians and for ordering all tests specified in testing protocols.

165)    Dr. Erica Powell, a Lancaster native and well-respected, board-certified emergency medicine physician, was the ER medical director at Lancaster Regional when Meyer took over the contract.  Powell worked well with CNO Tami Lee, the interim CEO of Lancaster, and the medical staff.

166)    HMA Division 1 Vice-President Marchi, however, was dissatisfied with Lancaster Regional's admission rate, which fluctuated between 10% and 15%, and, as a consequence, was dissatisfied with Powell's performance. Marchi informed Meyer, Powell, and Lancaster Regional's medical staff that HMA expected Lancaster Regional's admission rate to rise to 20%.

167)    In response to a directive by Marchi, EmCare Chief Medical Officer Michael Wheelis conducted a chart review of Lancaster Regional's admission overrides to determine if the physicians were discharging patients who should have been admitted.  He and Meyer visited Lancaster Regional in or about February 2010 and met with the ER medical staff.  After questioning the physicians about several instances in which they had rejected computer-

generated recommendations to admit patients, Wheelis did not find any instance in which he concluded that a patient was inappropriately discharged.

168)    Wheelis' determination that Powell and her staff were exercising sound medical judgment in deciding whether to admit or discharge patients did nothing to placate Marchi. Instead, Marchi continued to berate Powell for not raising admission rates and directed her to take immediate action to "correct" the situation.  For example, in an email to Powell dated May 5, 2010, Marchi complained that the admission rate was below that of prior years and "needs attention ASAP."  Powell replied that the departure of the Heart Group had resulted in a large decrease in admissions and suggested new measures to increase the profile of the ER in the community.  Ignoring Powell's suggestions for legitimate ways to increase admissions over time, Marchi demanded immediate results – results that could only be achieved through medically unnecessary admissions. Marchi wrote, "We need …THE ACTION to get this back where it was three years ago…time for everyone to step up and make it happen."

169)    Marchi also repeatedly complained to Meyer about Powell's failure to raise admission rates and suggested that EmCare should consider replacing her as medical director.

170)    In early 2010, HMA appointed Bob Moore as CEO of Lancaster Regional. Moore, like Marchi, complained about the admission rates and expressed dissatisfaction with Powell.

171)    In May 2010, during an EmCare National Leadership Conference in Dallas, Texas, Powell and her assistant medical director Dr. Christine Dang told Meyer that they were distressed that HMA was seeking to corrupt the ER physicians' medical judgment through the unrelenting pressure HMA imposed on physicians to admit more patients.   Meyer responded

that Powell and Dang were the doctors and that Meyer would not second-guess their medical judgment.

172)     In August 2010, EmCare removed Meyer from oversight over Lancaster Regional.

173)     Shortly after Meyer's removal, Steve Bartow, her supervisor, told Meyer that Moore had asked him to fire Dr. Powell as medical director.  Bartow told Meyer that he was going to try to dissuade HMA from terminating Dr. Powell's termination by invoking Powell's "protected status" as an African-American, pregnant female.

Heart of Lancaster Regional Medical Center

174)     Heart of Lancaster Regional Medical Center ("Heart of Lancaster") is a 148-bed facility in Lititz, Pennsylvania owned and operated by HMA.  HMA contracts with EmCare to provide ER personnel and management services.

175)     Relator Cowling served as CEO over Heart of Lancaster from December 2006 until April 2008, before HMA began to unlawfully pressure the ER physicians at Heart of Lancaster to increase ER admission rates.

176)     Heart of Lancaster, like Lancaster Regional, has difficulty competing with Lancaster General, which offers many more specialists and services for seriously-ill patients.  Its admission rate fluctuates between 10% and 15%.

177)     In or about August 2009, Relator Meyer was assigned to oversee EmCare's ER contract at Heart of Lancaster.  By this time, HMA executive management had instituted many of the processes and procedures at Heart of Lancaster that HMA was using at other hospitals to pressure and induce physicians to raise ER admission rates.  These practices included: setting unrealistically high target admission rates that physicians were pressured to reach; holding flash

meetings to interrogate physicians about "missed admissions"; and monitoring adherence to corporate benchmark rates for telephone calls to primary care physicians, testing protocols, and admission overrides.

178)     HMA also contracted with EmCare to pay monthly bonuses to Heart of Lancaster's full-time ER physicians and medical directors for exceeding corporate benchmarks designed to increase admission rates, including, *inter alia,* for calls to primary physicians. However, when these bonus payments did not result in increased admissions as HMA had planned, Heart of Lancaster CEO Karen Metz complained to Meyer that the physicians were not "selling admissions" during telephone calls to primary care physicians.  She demanded that EmCare instruct its ER physicians on how to sell admissions to primary care physicians.  Meyer referred this request to Dr. Wheelis.

179)     Metz continually complained to Meyer that Heart of Lancaster's admission rate was too low.  She warned Meyer on many occasions that she would rather terminate EmCare's contract then risk being fired as CEO because of low admission numbers.

180)     In or about April 2010, EmCare removed the ER medical director for reasons unrelated to admission rates.  Thereafter, Meyer asked Dr. Eric Goldman, an ER physician who worked occasionally at Heart of Lancaster and Lancaster Regional, to serve as Heart of Lancaster's interim ER medical director.  Dr. Goldman told Meyer that he did not want to take the position because he believed that the manner in which HMA pushed ER physicians to increase admission rates was "fraudulent."   Meyer responded that she would not ask Goldman to recommend admission of any patient unless Goldman determined that it was medically necessary.  In or about June 2010, Goldman reluctantly agreed to become the interim medical director.

181)   Two months later, EmCare, at the request of HMA, removed Meyer from all HMA Division 1 accounts, including Heart of Lancaster.

<u>Additional Examples of Defendants' Unlawful Conduct</u>

182)   Defendants employed the tactics described in paragraphs 62 through 80 to unlawfully boost admission rates at all HMA hospitals throughout the United States.

183)   For example, Andy Davis, the former CEO of Sandhills Regional Medical Center ("Sandhills") in Hamlet, North Carolina, reported in a January 2009 "Volume Action Plan" submitted to HMA corporate headquarters that his administrators would "continue flash meetings and monitoring the ER daily" in order to maintain Sandhills' high admission percentage.

184)   Davis' successor, Mike McNair, similarly pressured ER physicians at Sandhills to increase admissions.  In an email to Relator Meyer and Dr. Wheelis dated April 23, 2010, McNair complained about a part-time ER physician whose admission rate was lower than other doctors'.  McNair was also dissatisfied because this particular doctor instructed ER staff not to automatically order all tests specified in the testing protocols, but to wait instead until he examined the patient and determined what tests were medically necessary. McNair stated in his email that he would "remind" the doctor "of the importance of meeting our expectations." McNair warned Meyer and Wheelis that a proposed pay increase for the ER physicians would be tied to their success in boosting admissions. He wrote:

> I don't know if you would also like to talk with [the ER physician] but I cannot afford to have an outlier that cant [sic] get the picture.  I know you guys are asking for more money and I will go to bat for you about that but I need every physician to perform.

185)   Three weeks later, McNair wrote the following email to Wheelis and Meyer with a copy to HMA Division 1 Vice-President Marchi:

Michael-Jackie I was here at the hospital Saturday to spend time with Dr Adekanmbi and go over my ground rules and I had Thomas do the same Sunday with Dr Freeman. Looking at the reports particularily [sic] Sunday I am not impressed with the response from the physicians. There were at least 2 from yesterday that I feel the attending should have been called for patients over 65. We need every VALID admission we can get this month. The schedule looks the same for the next 2 weekends. I also asked Dr Farah to call Sunday to talk with Dr Freeman about what my expectations are. **I cannot have guys here who don't follow the rules.** Mike (Emphasis added.)

186)     McNair also employed the same pressure tactics when he was CEO of Franklin Regional Medical Center ("Franklin") in Louisburg, North Carolina in 2009.  He reported in a January 2009 Volume Action Report that he had raised admission rates and intended to achieve HMA's 16% target admission rate for Franklin by:

- "daily rounding in the ER and meeting with physicians and staff to discuss patient activity and expected results;"
- "daily continuous review by CEO of ER activity on office computer;" and
- meeting with EmCare to "get the right physicians on board to achieve results."

187)     McNair continually complained to Meyer that EmCare's doctors were not admitting enough patients at Franklin and asked her to call every ER doctor to discuss admission rates.

188)     Monte Bostwick, CEO of Biloxi Regional Medical Center in Biloxi, Mississippi, likewise exerted pressure on his ER physicians to increase admissions.  During the four months that Meyer oversaw this hospital, both ER medical director Tom Seglio and a physician's assistant complained to Meyer that Bostwick was exerting undue pressure on them to admit more patients.

189)     Joe Howell, the CEO of Upstate Carolina Regional Medical Center ("Upstate") in Gaffney, South Carolina, confided in Meyer that the target ER inpatient admission rates that

Case 1:14-cv-00586-RBW   Document 1   Filed 07/15/11   Page 50 of 61

HMA had set for Upstate were unrealistic and that he was under tremendous pressure by HMA corporate management to increase admissions. Upstate's ER Nursing Director, Jason Moretz, frequently complained to Meyer that HMA was wrongfully pressuring hospital doctors and staff to increase admission rates.  Moretz told Meyer that he personally reviewed the patient charts for cases in which the ER physicians overrode the computer-generated admission recommendations and concluded that the doctors' decisions were appropriate.

190)    In October 2009, HMA sold Upstate to Novant Health, a not-for-profit hospital chain. Howell, who remained as CEO after the sale, reported to Meyer that he was much happier under the new ownership because Novant, unlike HMA, did not pressure him and his physicians to increase ER inpatient admissions. Moretz told Meyer that Novant focused on the right things, like quality of care and patient satisfaction, while HMA focused solely on increasing admissions.

191)    At Pasco Regional Medical Center in Dade City, Florida, CEO Stan Holm complained to Meyer when a physician's admission rate fell below the other ER doctors and asked Meyer to teach one particular physician how to "sell admissions" in telephone calls to primary care physicians.

192)    At Fisherman's Hospital in Marathon, Florida, HMA posted daily color-coded physician scorecards listing every physician's ER statistics in green, yellow or red.  These colors indicated whether the physician met, came close to meeting, or failed to meet benchmarks for admissions, adherence to testing protocols and calls to primary care physicians.

193)    On Saturday, July 5, 2008, an HMA Senior Vice-President Page Vaughan instructed the hospital CEOs for Chester, Upstate, Sandhills, Carolina Pines, Franklin, LNRMC, and Davis ("Division hospital CEOs") that "[w]e have to increase ED admissions." Vaughan

stated that he was meeting with EmCare Regional CEO Terry Meadows to get EmCare's "help in correcting this issue."

194)     On Saturday, August 09, 2008, Vaughan instructed the Division hospital CEOs that "ED admissions are a must right now and I want you reviewing your results in the ED with the manager and physician every day."  He warned the Division hospital CEOs that "[t]his is not the time to have a wek (sic) manager, debate about ProMed or **physicians who practice outside of our guidelines."** (Emphasis added.)

195)     On August 27, 2008, HMA Division 1 Vice-President Vicki Briggs told the Division 1 hospital CEOs that, pursuant to instructions from HMA COO Kelly Curry, they were required to have an "Executive presence" in the ER.  Briggs also relayed Kelly's concern that ER doctors were "overriding Promed in admit decisions" and instructed the CEOs to "review" this with their ER directors.

196)     In November 2008, HMA Division 1 CFO Chris Hilton prepared and disseminated to the hospital CEOs and CFOs  "revised" FY 2009 hospital budgets for Chester, Upstate, Sandhills, Carolina Pines, Franklin, LNRMC, and Davis in which he increased the ER budgeted inpatient admission rates for each hospital by 1% over the prior year.  Hilton did not cite any changes in patient demographics or hospital services to support this increase.  The only rational Hilton offered for the increase in ER inpatient admission rates was that it would generate additional revenues and profits.

197)     Defendants also colluded to increase hospital admission rates by corrupting the medical judgment of hospitalists hired by EmCare to staff HMA hospitals. EmCare marketed its hospitalist services to HMA by promising that the use of both EmCare ER physicians and hospitalists would boost admissions because EmCare hospitalists would not turn down admission

requests from EmCare ER physicians.  An HMA hospital administrator informed Ms. Meyer that under an arrangement between HMA and EmCare, EmCare hospitalists working at HMA hospitals are not permitted to reject the admission recommendations of EmCare ER physicians. EmCare has provided hospitalist services at several HMA hospitals, including Carlisle Regional, LNRMC and Sebastian River Medical Center.

### Defendants' Lies to the Public about Their Corrupt Practices

198)    As Newsome predicted, defendants have driven up ER admission rates at numerous HMA hospitals (a) by demanding that ER physicians increase admissions irrespective of medical necessity, (b) by demanding that ER physicians adhere to testing protocols, irrespective of medical necessity; and (c) by carefully monitoring, through Pro-Med electronic reports, the following: the admission rate of every ER physician; the physician's adherence to testing protocols; and whether the physician met a quota for calls to primary care physicians. HMA's overall ER admission rate for Medicare-eligible patients rose by approximately 6% from December 2008 to December 2009, while several individual hospitals had double-digit percentage increases. Hospital administrators such as Relator Cowling and EmCare managers such as Relator Meyer, as well as numerous ER medical directors and physicians who refused "to get with the program," were fired.

199)    At the same time, defendants lied to the public about their corrupt practices and procedures. In an April 26, 2011 public conference call on HMA's first quarter earnings, Newsome was asked "how you use ProMed in the emergency room?" In response, he stated:

> ProMED is just a tool. Really all it is, is really a data gathering tool and it really -- what it does is help us with the time of throughput process. It helps us understand peaks and valleys in terms of our volume. It helps us staff appropriately in the emergency room where we can see patterns. It has quality indicators which associated with time and other parameters that help the clinical people understand how they're performing, really.

200)    When asked about "the admission process in terms of patients coming in from the ER," Newsome responded with another lie:

> The tools we have in place are really assets that the clinicians, both the nursing personnel and the physicians use just in the management of the patients and the process. As far as the decision to make an admission, that truly is the physician. It's in concert with the ER physician and the attending physician that the ER physician consults with. …. **Doctors are making decisions based on their clinical judgment and that's what you want doctors to do.**  (Emphasis added)[2]

### Defendants Submitted and Caused the Submission of False Claims

201)    By conditioning the continued employment of ER physicians on the number of ER admission recommendations they made; and further, by paying bonuses to ER physicians for "selling admissions" in telephone calls to primary care physicians, ordering all tests specified in HMA's testing protocols, and following computer-generated admission recommendations; and by employing the tactics set forth in paragraphs 1 through 197 above, defendants have violated the Anti-Kickback Statute and knowingly caused HMA hospitals to submit kickback-tainted and medically unnecessary false claims to Medicare, Medicaid and other Government insurance programs.  These false claims include HMA claims for inpatient hospital services provided to patients admitted through the ER, and HMA outpatient claims for hospital services provided in the ER.  These false claims also include EmCare physician claims for professional services provided by EmCare ER physicians and hospitalists to HMA patients. Defendants have also knowingly submitted and caused the submission of false claims and false statements material to false claims in the form of annual cost reports submitted by HMA hospitals under the Medicare Program.

---

[2]

http://www.intelliclix.net/index.nsp?sid=bp&pid=16&demo=1&show=&ticker=BAC&story_id=159052321&&ID=infobrix&scategory=Computers

202)    The following are representative examples of false claims and statements which Defendants submitted and caused to be submitted under the Medicare and Medicaid program:

i)    Chester Regional Medical Center, with Medicare provider number 42-0019, filed with its Medicare fiscal intermediary, WPS Medicare Legacy Part A (formerly Mutual of Omaha), a Medicare cost report covering items and services provided during the fiscal year ending September 30, 2009; and a Medicare cost report covering items and services provided during the fiscal year ending September 30, 2010.

ii)    Lake Norman Regional Medical Center, with Medicare provider number 34-0129, filed with its Medicare fiscal intermediary, WPS Medicare Legacy Part A (formerly Mutual of Omaha), a Medicare cost report covering items and services provided during the fiscal year ending September 30, 2009; and a Medicare cost report covering items and services provided during the fiscal year ending September 30, 2010.

iii)    Carolina Pines Regional Medical Center, with Medicare provider number 42-0010, filed with its Medicare fiscal intermediary, WPS Medicare Legacy Part A (formerly Mutual of Omaha), a Medicare cost report covering items and services provided during the fiscal year ending September 30, 2009, and a Medicare cost report  covering items and services provided during the fiscal year ending September 30, 2010.

iv)    Carlisle Regional Medical Center, with Medicare provider number 39-0058, filed with its Medicare fiscal intermediary, WPS Medicare Legacy Part A (formerly Mutual of Omaha), a Medicare cost report covering items and

services provided during the fiscal year ending June 30, 2009;  and a Medicare cost report covering items and services provided during the fiscal year ending June 30, 2010.

v) Lancaster Regional Medical Center, with Medicare provider number 39-0061, filed with its Medicare fiscal intermediary, WPS Medicare Legacy Part A (formerly Mutual of Omaha), a Medicare cost report covering items and services provided during the fiscal year ending March 31, 2008; and a Medicare cost report covering items and services provided during the fiscal year ending March 31, 2009.

vi) Heart of Lancaster Regional Medical Center, with Medicare provider number 39-0068, filed with its Medicare intermediary, WPS Medicare Legacy Part A (formerly Mutual of Omaha), a Medicare cost report covering items and services provided during the fiscal year ending June 30, 2009; and a Medicare cost report covering items and services provided during the fiscal year ending June 30, 2010.

Each of these cost reports was a false claim, as well as a false statement material to a false claim, because it included "items or services resulting from a violation of" the Anti-Kickback Statute, and medically unnecessary items and services.  42 U.S.C. §1320a-7b (g); 42 U.S.C. §1320c-5(a).

**COUNT ONE:  Knowingly Causing False Claims to be Presented**
**((31 U.S.C. § 3729(a)(1)(A)( 31 U.S.C. § 3729(a)(1))**

203)    Plaintiffs re-allege and incorporate the allegations contained in paragraphs 1 through 202, as if fully set forth herein.  This Count is a civil action against defendants for violating 31 U.S.C. § 3729(a)(1)(A) (post-May 2009 amendment) and 31 U.S.C. § 3729(a)(1) (pre-May 2009 amendment).

204)    By engaging in the conduct set forth herein, Defendants have knowingly presented and caused to be presented false or fraudulent claims for payment or approval, in violation of 31 U.S.C. § 3729(a)(1)(A) (post-May 2009 amendment) and 31 U.S.C. § 3729(a)(1) (pre-May 2009 amendment).

205)    Because of the defendants' conduct under this Count, the United States has suffered substantial actual damages.

## COUNT TWO:  False Statements or Records
### ((31 U.S.C. § 3729(a)(1)(B)( 31 U.S.C. § 3729(a)(2))

206)    Plaintiffs re-allege and incorporate the allegations contained in paragraphs 1 through 202, as if fully set forth herein.  This Count is a civil action against defendants for violating 31 U.S.C. § 3729(a)(1)(B) (post-May 2009 amendment) and 31 U.S.C. § 3729(a)(2)(pre-May 2009 amendment).

207)    By engaging in the conduct set forth herein, Defendants have knowingly caused to be made or used, false records or statements material to false or fraudulent claims, within the meaning of § 3729.

208)    Because of Defendants' conduct under this Count, the United States has suffered substantial actual damages.

## COUNT THREE:  Conspiracy to Violate False Claims Act
### (31 U.S.C. § 3729(a)(1)(C)( 31 § 3729(a)(3))

209)    Plaintiffs re-allege and incorporate the allegations contained in paragraphs 1 through 202, as if fully set forth herein.  This Count is a civil action against defendants for violating 31 U.S.C. § 3729(a)(1)(C) (post-May 2009 amendment) and 31 § 3729(a)(3) (pre-May 2009 amendment).

210)    Defendants have conspired with one another and others to present false or fraudulent claims for payment and to make false records and statements material to false or fraudulent claims.

211)    Because of the defendants' conduct under this Count, the United States has suffered substantial actual damages.

### COUNT FOUR: Florida False Claims Act
(Fla. Stat. §§ 68.081-68.09)

212)    Plaintiffs re-allege and incorporate the allegations contained in paragraphs 1 through 202, as if fully set forth herein.

213)    Based on the foregoing allegations, Defendants are liable under the Florida False Claims Act, Fla. Stat. § 68.081 et seq.

### COUNT FIVE: Georgia State False Medicaid Claims Act
(Georgia Code, Title 49, Ch. 4, Art. 7B)

214)    Plaintiffs re-allege and incorporate the allegations contained in paragraphs 1 through 202, as if fully set forth herein.

215)    Based on the foregoing allegations, the Defendants are liable under the Georgia State False Medicaid Claims Act, Georgia Code, Title 49, Ch. 4, Art. 7B.

### COUNT SIX: North Carolina False Claims Act
(N.C. Gen. Stat. § 1-605 et seq. (2010))

216)    Plaintiffs re-allege and incorporate the allegations contained in paragraphs 1 through 202, as if fully set forth herein.

217)    Based on the foregoing allegations, the Defendants are liable under the North Carolina False Claims Act, N.C. Gen. Stat. § 1-605 et seq. (2010).

**COUNT SEVEN: Oklahoma Medicaid False Claims Act**
Oklahoma Statutes Title 63 § 5053.1.

218)   Plaintiffs re-allege and incorporate the allegations contained in paragraphs 1

through 202, as if fully set forth herein.

219)   Based on the foregoing allegations, the Defendants are liable under the Oklahoma

Medicaid False Claims Act CITE

**COUNT EIGHT: Tennessee Medicaid False Claims Act**
( 71-5-181 through 71-5-185 (2009))

220)   Plaintiffs re-allege and incorporate the allegations contained in paragraphs 1

through 202, as if fully set forth herein.

221)   Based on the foregoing allegations, the Defendants are liable under the Tennessee

Medicaid False Claims Act, 71-5-181 through 71-5-185 (2009).

**COUNT NINE: Texas False Claims, Texas Human Resources Code**
(§ 36.002 et seq. (2009))

222)   Plaintiffs re-allege and incorporate the allegations contained in paragraphs 1

through 202, as if fully set forth herein.

223)   Based on the foregoing allegations, the Defendants are liable under the Texas

Hum. Res. Code § 36.002 et seq. (2009).

**COUNT TEN: False Claims Act Anti-Retaliation Provision**
**(31 U.S.C. § 3730(h) (2009))**

224)   Plaintiff Jacqueline Meyer re-alleges and incorporates the allegations contained in

paragraphs 1 through 202, as if fully set forth herein. This Count is a civil action brought by

Plaintiff Meyer against the EmCare defendants and defendant HMA for violating the anti-

retaliation provision of the False Claims Act, 31 U.S.C. § 3730(h).

225)     As set forth in paragraphs 1 through 202, during the course of her employment with EmCare, Inc., and while acting under contracts with HMA and its subsidiaries, Plaintiff Meyer repeatedly attempted to stop Defendants' violations of the False Claims Act.  Plaintiff refused to comply with Defendants' unlawful instructions to coerce EmCare physicians and medical directors to admit patients, irrespective of medical necessity.  In a further effort to stop Defendants' unlawful actions, Meyer made reports to her supervisors and EmCare compliance officials regarding Defendants' actions and her belief that Defendants were engaged in fraudulent admission practices, in violation of the False Claims Act.

226)     Defendants were aware that Plaintiff Meyer had engaged in activities to stop violations of the False Claims Act and in furtherance of a potential action under the *qui tam* provisions of the False Claims Act.

227)     Because Plaintiff Meyer was engaged in activities that are protected under the False Claim Act's anti-retaliation provision, 31 U.S.C. § 3730(h), Defendants repeatedly retaliated against Meyer, including disparaging her job performance and reputation, removing and causing Meyer's removal from HMA Division 1 accounts, taking disciplinary action against her and finally terminating and causing the termination of Plaintiff's employment.

228)     As a direct and proximate result of the foregoing, Plaintiff Meyer has lost the benefit and privileges of employment, and has suffered additional economic and non-economic damages, including severe emotional anguish and irreparable, continuing harm to her career. Plaintiff is entitled to all relief necessary to make her whole.

**COUNT ELEVEN: Tortious Interference with a Business Relationship**

229)     Plaintiff Jacqueline Meyer re-alleges and incorporates the allegations contained in paragraphs 1 through 202, as if fully set forth herein. This Count is a civil action brought by Plaintiff Meyer against defendant HMA.

230)     Plaintiff Meyer was employed by EmCare, Inc. as a Regional Client Administrator.

231)     Defendant HMA knew of Plaintiff's employment relationship with EmCare, Inc.

232)     Defendant HMA intentionally, unjustifiably, and maliciously, and with improper purpose, interfered with Plaintiff's employment relationship with EmCare, Inc. in retaliation for Plaintiff Meyer's refusal to assist HMA in its fraudulent scheme to increase hospital admissions.

233)     As a result of HMA's intentional and unjustifiable interference, EmCare, Inc. stripped Plaintiff of the majority of her job responsibilities and ultimately terminated her employment with EmCare, Inc.

234)     As a direct and proximate result of the foregoing, Plaintiff Meyer has lost the benefit and privileges of employment, and has suffered additional economic and non-economic damages, including severe emotional anguish and irreparable, continuing harm to her career. Plaintiff is entitled to all relief necessary to make her whole.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Jacqueline Meyer and Michael Cowling pray for the following relief:

1.     On Counts One through Nine, judgment for the United States or the State, as applicable, against each Defendant in an amount equal to three times the damages the federal or state plaintiff government has sustained because of the Defendant's actions, plus a civil penalty of $11,000 for each violation;

2.      On Counts One through Nine, an award to the Relators of the maximum allowed under the federal or state law under which suit is brought by the Relators on behalf of the federal or state plaintiff;

3.      On Count Ten, judgment for Plaintiff Meyer, against the EmCare defendants and defendant HMA in an amount equal to twice her back-pay losses, front pay, interest, and special damages for emotional distress and harm to her reputation by reason of Defendants' actions.

4.      On Count Eleven, judgment for Plaintiff Meyer, against Defendant HMA in an amount equal to the damages sustained by Plaintiff by reason of Defendant HMA's action, and for punitive damages pursuant to Fla. Stat. § 768.72 (2011).

5.      Against the Defendants, attorneys' fees, expenses and costs of suit herein incurred; and

6.      Such other and further relief as the Court deems just and proper.

### DEMAND FOR JURY TRIAL

Plaintiffs hereby demand that this matter be tried before a jury.

Respectfully submitted,

s/ John C. Moylan, III
John C. Moylan, III (Fed. I.D. # 5431)
WYCHE, P.A.
Post Office Box 12247
Columbia, SC 29211-2247
Tel. No.:  803-254-6542; Fax No.:  803-254-6544
jmoylan@wyche.com

OF COUNSEL:

Janet L. Goldstein
VOGEL, SLADE & GOLDSTEIN, LLP
1718 Connecticut Avenue, NW, 7th Floor
Washington, D.C. 20009
Tel. No.: 202 537-5906;   Fax No.: 202-537-5905
jgoldstein@vsg-law.com

July 15, 2011                                        Attorneys for Jacqueline Meyer and Michael Cowling